[Cite as *State v. Moore*, 2023-Ohio-1000.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

LORICE MOORE,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 MA 0013**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 19 CR 19A

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor*, and *Atty. Ralph M. Rivera*, Assistant Prosecuting Attorney, Mahoning County Prosecutor's Office, 21 West Boardman Street, 6th Floor, Youngstown Ohio 44503, for Plaintiff-Appellee and

*Atty. John B. Juhasz*, 7081 West Boulevard, Suite 4, Youngstown Ohio 44512, for Defendant-Appellant.

Dated: March 28, 2023

**HANNI, J.**

{¶1} Defendant-Appellant, Lorice Moore, appeals from a Mahoning County Common Pleas Court judgment convicting him of murder and attempted murder, following a jury trial.

{¶2} On November 17, 2018, Christopher Jackson's father heard him come into the house and then leave again between 11:30 p.m. and 11:45 p.m. Just before 2:00 a.m. on November 18, 2018, two calls were placed to 911 with the callers reporting hearing gunshots on Youngstown's east side. Police found Christopher Jackson dead in the front passenger-side seat of Carlos Davis's car. The car was located in a field near the intersection of Stewart Street and Bennington Avenue. Jackson had been shot nine times from behind while he was in the car. Police found shell casings and projectiles at the scene from at least three different firearms.

{¶3} Police found Carlos Davis on the front porch of a Stewart Street home. Davis had been shot twice in the back. Paramedics arrived and transported Davis to the hospital. Davis survived his injuries.

{¶4} Davis initially cooperated with police. After speaking with Davis, police began looking into a person with the nickname "Yung Chip." They were able to determine that "Yung Chip" was a man named Stephon Hopkins. In one of his Facebook photographs, Hopkins was seen holding a key chain that appeared to be the same key chain that was found in the backseat of Davis's car at the scene of the murder. Additionally, one of the keys on the key chain found at the murder scene unlocked the back door to Hopkins's residence. Through Facebook, police learned that Appellant and Hopkins were associated with each other. Police also identified Brian Donlow as a third suspect.

{¶5} Facebook communications further revealed that Hopkins was in contact with Jackson multiple times from 12:59 a.m. on November 18, 2018, until 1:12 a.m. There was also a message from Hopkins to Jackson, sent after Jackson was killed. Additionally, Facebook records revealed that Appellant had multiple contacts with Hopkins during that same time period.

{¶6} Appellant's DNA was found on the rear passenger-side interior door handle and the rear passenger-side exterior door handle of the car where Jackson's body was found. Stephon Hopkins's DNA was found on the key chain that was located in the car.

{¶7} During an interview with police, Appellant initially denied knowing Hopkins and Jackson. After he was confronted with the fact that his DNA was found in the backseat of the vehicle Jackson was killed in, Appellant then admitted knowing Jackson. When Appellant was left in the interview room alone, but was still being recorded, Appellant could be heard praying to God for forgiveness and stating, "I know I took one of your children." (Tr. 825-826).

{¶8} On January 10, 2019, a Mahoning County Grand Jury indicted Appellant and Hopkins in a joint indictment on one count of aggravated murder, a special felony in violation of R.C. 2903.01(A); one count of murder, a special felony in violation of R.C. 2903.02(A)(D); one count of attempted aggravated murder, a first-degree felony in violation of R.C. 2923.02 and R.C. 2903.01(A); one count of attempted murder, a first-degree felony in violation of R.C. 2923.02 and R.C. 2903.02(A); one count of felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(2)(D); and firearms specifications in violation of R.C. 2941.145. The indictment also charged Hopkins with having weapons under a disability. Donlow was also indicted.

{¶9} The matter proceeded to a five-day jury trial for Appellant and Hopkins beginning on November 8, 2021. Donlow was tried separately in a bench trial. The jury found both Appellant and Hopkins not guilty of aggravated murder and attempted aggravated murder. It found Appellant and Hopkins both guilty of murder, attempted murder, and felonious assault, all with firearm specifications.

{¶10} The trial court later held a sentencing hearing. The court found that, for sentencing purposes, the attempted murder and felonious assault convictions merged with one another. The state elected to proceed to sentencing on the attempted murder conviction. The court then sentenced Appellant to 15 years to life on the murder count, with an additional three years for the firearm specification to be served prior to and consecutive to the murder sentence. It also sentenced Appellant to 11 years on the attempted murder count, with an additional three years for the firearm specification to be served prior to and consecutive to the attempted murder sentence. The court ordered

Case No. 22 MA 0013

Appellant to serve the sentences consecutively to each other for a total sentence of 32 years to life in prison.

**{¶11}** Appellant filed a timely notice of appeal on December 21, 2021. He now raises four assignments of error for our review.

**{¶12}** Appellant's first assignment of error states:

APPELLANT WAS DENIED DUE PROCESS, TRIAL BY AN IMPARTIAL JURY, AND EQUAL PROTECTION WHEN THE TRIAL COURT PERMITTED THE STATE TO REMOVE A BLACK JUROR WITHOUT SOUND CAUSE.

**{¶13}** Appellant argues the fact that plaintiff-Appellee, the State of Ohio, excused one of only two African Americans on the jury panel and one of only three African Americans on the venire, established a prima facie case that the state excused the juror based on his race. He argues the state's explanation was pre-textual for excusing Juror No. 12. Appellant points out that Juror No. 12 stated that he could follow the court's instructions.

**{¶14}** The Ohio Supreme Court has set out the steps for analyzing a race-based challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), as follows:

First, the opponent of the peremptory strike must make a prima facie case of racial discrimination. Second, if the trial court finds that the opponent has fulfilled this requirement, then the proponent of the strike must come forward with a racially neutral explanation for the strike. * * * The 'explanation need not rise to the level justifying exercise of a challenge for cause.' [*Batson*, 476 U.S.] at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

Third, if the proponent puts forward a racially neutral explanation, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved purposeful racial discrimination. * * * The burden of persuasion is on the opponent of the strike.

Case No. 22 MA 0013

(Internal citations omitted); *State v. Herring*, 94 Ohio St.3d 246, 255-256, 2002-Ohio-796, 762 N.E.2d 940.

**{¶15}** An appellate court will not reverse the trial court's decision of no discrimination unless it is clearly erroneous. *State v. Hernandez*, 63 Ohio St.3d 577, 583, 589 N.E.2d 1310 (1992).

**{¶16}** Here, Appellant made a prima facie case of racial discrimination. When the prosecutor indicated that he wished to use a peremptory challenge to excuse Juror No. 12, Hopkins's attorney raised a *Batson* challenge, which Appellant's attorney joined. (Tr. 248). Counsel noted that out of 50 potential jurors, three of them were African Americans. (Tr. 248). Counsel also noted that of the 12 jurors in the jury box at that time, two of them (including Juror No. 12) were African Americans. (Tr. 248). At that time, the trial court noted that the burden shifted to the state. (Tr. 249).

**{¶17}** Attorney Ingram was one of Hopkins's attorneys in this case. The prosecutor's stated reasons for excusing Juror No. 12 were as follows:

Fairly obviously * * * [Juror No. 12] was, his daughter had a case in Mahoning County he did not put on his questionnaire. And understandably so. He would, probably forgot about it.

But Attorney Ingram was his daughter's attorney. So essentially his little girl's freedom was in Attorney Ingram's hands at one point in time.

Even going further, I didn't really seem to get a good reaction from * * * [Juror No. 12] as far as the Struthers police involvement. He was a bit hesitant when I asked him if he was satisfied with the way they did their job.

And he had mentioned something along the lines of she was with another guy; it was his stuff. Which also cuts to this case, the complicity implication.

Obviously, the former attorney-client relationship with Attorney Ingram and his daughter is my main concern. But there were other things that went into this.

So if it weren't for those things I'd actually like him as a juror. But I just don't think we'd be doing our job if we kept him on. Thank you.

(Tr. 249-250).

**{¶18}** These reasons provided by the prosecutor for excusing Juror No. 12 constituted a racially neutral explanation for the strike. The prosecutor was concerned that one of the defendants' attorneys had represented Juror No. 12's daughter in her criminal case. And Juror No. 12 did not initially disclose this information on his questionnaire. Additionally, the prosecutor did not feel that Juror No. 12 had a good reaction to how the Struthers Police had handled his daughter's case. Finally, the prosecutor expressed a concern regarding how Juror No. 12 felt about complicity charges, which were an issue in this case, given his daughter's case.

**{¶19}** Because the state put forward a racially neutral explanation for the strike, it was then up to the trial court to decide whether Appellant proved purposeful, racial discrimination by the state. The trial court found here "that the explanation given by the state was reasonable and was clear and was not based on race." (Tr. 250).

**{¶20}** The trial court's decision is dependent upon credibility determinations that it "must make of the prosecutor and the prosecutor's articulated assessment of the prospective juror's behavior during voir dire, which the trial court also has the benefit of observing." *State v. Dixon*, 7th Dist. Mahoning No. 10 MA 185, 2013-Ohio-2951, ¶ 17. Here, the trial court was able to observe the prosecutor and judge his credibility. And while Appellant takes issue with the prosecutor's explanation for using a peremptory challenge to excuse Juror No. 12, the prosecutor was not required to give an explanation that satisfied defense counsel. "A race-neutral explanation for a peremptory challenge is simply 'an explanation based on something other than the race of the juror.'" *State v. Baer*, 7th Dist. Harrison No. 07 HA 8, 2009-Ohio-3248, ¶ 54, quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 3953 (1991). The explanation requires some relevancy, but it does not need to be "persuasive" or "plausible" as long as the reason is not inherently discriminatory. *Id.*, citing *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), quoting *Purkett v. Elem*, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Based on the above, we cannot conclude the trial court's decision was clearly erroneous.

**{¶21}** Accordingly, Appellant's first assignment of error is without merit and is overruled.

**{¶22}** Appellant's second assignment of error states:

APPELLANT WAS DENIED A FAIR TRIAL AND DUE PROCESS WHEN THE STATE WAS PERMITTED TO USE OTHER ACTS EVIDENCE, NOT TO PROVE ONE OF THE THINGS LISTED IN THE STATUTE OR THE RULE, BUT ON THE THEORY THAT APPELLANT'S CREDIBILITY WAS AN ISSUE.

**{¶23}** Here, Appellant contends the state used "other acts" evidence improperly. Specifically, Appellant asserts the court should not have permitted the state to introduce evidence: (1) that he lied to Detective Michael Lambert; (2) that in a prayer he told God he took one of God's children; and (3) that in a Facebook message he mentioned a "380" and a "40," presumably in reference to weapons. Appellant asserts the state's reason for introducing this evidence was to impeach his credibility. However, Appellant argues, his credibility was not at issue because he did not testify. Appellant contends the fact that he may have lied was not relevant. Thus, the evidence did not meet Evid.R. 402. Because the subjects that he may have lied about to Det. Lambert were not relevant to whether he committed the crimes charged, Appellant argues the evidence was inadmissible.

**{¶24}** The admission or exclusion of evidence is within the trial court's broad discretion and this court will not reverse its decision absent an abuse of that discretion. *State v. Mays*, 108 Ohio App.3d 598, 617, 671 N.E.2d 553 (1996). Abuse of discretion connotes more than an error of judgment; it implies that the trial court's judgment was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E .2d 144 (1980).

**{¶25}** Generally, relevant evidence is admissible. Evid.R. 402. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

**{¶26}** Pursuant to Evid.R. 404(B), evidence of prior bad acts is inadmissible to prove the accused acted in conformity with his bad character. *State v. Treesh*, 90 Ohio

St.3d 460, 482, 739 N.E.2d 749 (2001). But evidence of other crimes, wrongs, or acts can be admissible to demonstrate motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evid.R. 404(B).

{¶27} We will examine each statement Appellant takes issue with in turn.

{¶28} First, Appellant takes issue with Det. Lambert's testimony that Appellant lied during his police interview. During the three-hour interview, Det. Lambert asked Appellant multiple times if he knew Stephon Hopkins. (Tr. 813, 819). At first, Appellant denied knowing Hopkins. (Tr. 816, 819). But after the interview went on for some time, Appellant admitted that he did know Hopkins. (Tr. 819). Det. Lambert also asked Appellant if he knew Christopher Jackson. (Tr. 820). At first, Appellant denied knowing Jackson. (Tr. 820). The detective specifically asked Appellant if he was ever in a car with Jackson, to which Appellant responded "no." (Tr. 820). Then Det. Lambert informed Appellant that his DNA was found in the car where Jackson was murdered. (Tr. 821). At that point, Appellant admitted that he had known Jackson. (Tr.821-822). Appellant stated that Jackson had dropped him off somewhere but could not remember where. (Tr. 823).

{¶29} This evidence is relevant to the issues in this case. If Appellant did not know Hopkins or Jackson, he likely would not have been involved in the crimes charged. And the fact that Appellant denied knowing Hopkins and Jackson until confronted with evidence to the contrary, could suggest to the jury that Appellant was attempting to hide his connection to those two men and the murder from the police. This is not a case where the evidence of Appellant's lies was being offered "to prove the accused acted in conformity with his bad character" as is prohibited by Evid.R. 404(B). Whether Appellant may be a liar does not prove that he acted in conformity with this bad character trait in committing a murder or attempted murder. Because Det. Lambert's testimony regarding Appellant's inconsistent statements is relevant and is not in violation of Evid.R. 404(B), the trial court did not abuse its discretion in admitting this testimony.

{¶30} Second, Appellant takes issue with a statement that he made while he was left alone in the interview room. During Det. Lambert's interview of Appellant, the detective had to leave Appellant alone in the interview room to deal with another matter. (Tr. 824). Before leaving Appellant, the detective informed Appellant that he was still being video and audio taped. (Tr. 824). After Det. Lambert left the room, Appellant began

to pray. (Tr. 825; State Exs. 185 185A). In his prayer, Appellant stated: "God be with me. Guide me through (inaudible). Guide me through. I know I took one of your children but I also blessed you with plenty more. So if you can just have faith and power to accept me and for things to get better than they are, yes." (Tr. 826; State Exs. 185, 185A). Det. Lambert read this statement to the jury and the video was played. Appellant objected to the playing of the video but not to the testimony of his statement. (Tr. 827).

**{¶31}** Appellant argued to the trial court that, during his prayer, he was talking about a baby he had convinced his girlfriend to abort when he was a teenager. (Tr. 734). Therefore, he asserted this evidence of a prior bad act was meant to inflame the jury. (Tr. 734).

**{¶32}** This statement by Appellant was not used as a prior bad act or "other acts" evidence as Appellant asserts. There was no mention whatsoever to the jury about an abortion. The testimony was a recitation of what Appellant said when he was left alone in the interview room after being questioned for several hours regarding the crime at issue. It was up to the jury how to interpret Appellant's statement. Thus, the trial court did not abuse its discretion in allowing this evidence.

**{¶33}** Finally, Appellant takes issue with Det. Lambert's testimony regarding a comment from Appellant's Facebook account. As part of his investigation, Det. Lambert obtained a warrant for Appellant's Facebook account. (Tr. 808; State Ex. 189). Det. Lambert testified that on November 1, 2018 (17 days before the murder), Appellant made a statement on Facebook to a man named Dom Phillips that, "Already you to blood n whenever Treal give me that 380 tomorrow he might be fakin but you can hold on to that bitch since I got the 40." (Sic.; Tr. 811). Det. Lambert then acknowledged that .380 caliber shell casings were found in Davis's car at the murder scene and .40 caliber shell casings were found both inside and outside of the car. (Tr. 811-812). Appellant's counsel objected to this testimony. (Tr. 811).

**{¶34}** This statement also does not fall into the category of "other bad acts" evidence. It was a comment on Appellant's Facebook account that could be interpreted as providing relevant evidence since it appears to reference two of the three types of firearms used in this case. Thus, the trial court did not abuse its discretion in admitting it.

{¶35} Accordingly, Appellant's second assignment of error is without merit and is overruled.

{¶36} Appellant's third assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED APPELLANT A FAIR TRIAL BY ALLOWING CARLOS DAVIS TO TAKE THE STAND AND ASSERT HIS CONSTITUTIONAL PRIVILEGE.

{¶37} In this assignment of error, Appellant asserts that because Davis refused to testify at Donlow's trial, the trial court should have held a hearing outside of the jury's presence to determine whether Davis was going to invoke his Fifth Amendment privilege against self-incrimination and refuse to testify at this trial. Appellant argues that by allowing the state to call Davis to the stand only to assert his privilege not to testify implicitly suggested to the jury that Davis was shot by Appellant and Hopkins but was afraid to testify.

{¶38} A trial court has discretion to excuse a witness from testifying to protect the witness's privilege against self-incrimination. *State v. Linkous*, 4th Dist. Scioto No. 12CA3517, 2013-Ohio-5853, ¶ 57. Therefore, we review the trial court's decision here for abuse of discretion.

{¶39} At the beginning of the trial, the state informed the court and Appellant that it intended to call Davis to the stand but that if Davis refused to testify, it would move on to call its other witnesses. (Tr. 23-27). Neither the state, the defense, nor the trial court considered the issue to be one relating to the Fifth Amendment right against self-incrimination. (Tr. 23-27). Instead, the court addressed the parties' concerns that the state might try to elicit Davis's statements to Det. Lambert by way of the forfeiture to wrongdoing exception to the hearsay rule. (Tr. 23-27). This is the course the state took in the Donlow trial when Davis refused to testify there. (Tr. 23-24). Pursuant to Evid.R. 804(B)(6), the forfeiture by wrongdoing hearsay exception permits the admission of: "A statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." The trial court stated here that if the issue were to arise, it would deal with it at that time. (Tr. 25-26). The state indicated in this case that it did plan to call Davis to

testify, but that if Davis refused, it would not solicit his statements by way of Det. Lambert as it had in the Donlow trial. (Tr. 25).

{¶40} When the state called Davis to the stand, Appellant objected on a limited basis arguing that Davis should not be permitted to testify as to an identification in a photo lineup. (Tr. 447-449). The court overruled that objection. (Tr. 449). Davis then took the witness stand and the following took place between the prosecutor and Davis:

Q.     On November 18th, 2018, Carlos, were you shot?

A.     I plead the Fifth.

Q.     You plead the Fifth? We've been through this before, Carlos, right?

A.     I plead the Fifth.

Q.     You plead the Fifth. Does this mean you're not going to answer any questions, Carlos?

A.     I plead the Fifth.

MR. YACOVONE: All right. Your Honor, at this time I'm going to   ask the witness be declared hostile.

* * * [off-the-record discussion]

THE COURT: Okay. I'm going to excuse Mr. Davis at this time.

(Tr. 451-452).

{¶41} In support of his argument here, Appellant relies on *State v. Kirk*, 72 Ohio St.3d 564, 651 N.E.2d 981 (1995), at paragraph one of the syllabus, which held that a "trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination." But the Supreme Court specifically held that the trial court *may* exclude a person from testifying when the person intends to assert the Fifth Amendment privilege, not that it *must* exclude the person. Thus, while the trial court here was permitted to excuse Davis

if it knew ahead of time that he was going to assert the Fifth Amendment privilege, it was not required to do so.

**{¶42}** Given Davis's refusal to testify at the Donlow trial, the parties and the trial court in this case were on notice that Davis would likely refuse to testify at this trial as well. While the trial court was not required to do so, the better practice in this situation would have been to hold a hearing outside of the jury's presence to determine whether Davis would actually testify in this case. Nonetheless, we cannot conclude the trial court abused its discretion in this matter. The parties brought the potential issue to the court's attention prior to the start of trial. The court addressed it, seemingly to the parties' satisfaction. And when the state called Davis to testify, Appellant did not raise an objection except to the limited issue of a photo lineup.

**{¶43}** Accordingly, Appellant's third assignment of error is without merit and is overruled.

**{¶44}** Appellant's fourth assignment of error states:

APPELLANT WAS DENIED DUE PROCESS WHEN THE TRIAL JUDGE FAILED TO DIRECT A VERDICT OF ACQUITTAL AS TO THE CHARGE OF FELONIOUS ASSAULT, AND APPELLANT WAS THEREAFTER CONVICTED OF THE SAME BY A JURY.

**{¶45}** In his final assignment of error, Appellant contends the trial court should have directed a verdict of acquittal on the felonious assault and attempted murder charges. He contends there was insufficient evidence to convict him of these charges.

**{¶46}** Crim.R. 29 provides for the defendant to make a motion for acquittal if the evidence is insufficient to sustain a conviction. An appellate court applies the same test when reviewing a challenge based on a denial of a motion for acquittal as when reviewing a challenge based on the sufficiency of the evidence. *State v. Thompson*, 127 Ohio App.3d 511, 525, 713 N.E.2d 456 (8th Dist.1998).

**{¶47}** Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380,

386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113. When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *State v. Thorn*, 7th Dist. Belmont No. 16 BE 0054, 2018-Ohio-1028, ¶ 34, citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991) (superseded by state constitutional amendment on other grounds).

**{¶48}** The jury found Appellant guilty of attempted murder in violation of R.C 2903.02(A) and R.C. 2923.02(A). R.C. 2903.02(A) provides: "No person shall purposely cause the death of another[.]" And R.C. 2923.02(A) provides: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

**{¶49}** The jury also found Appellant guilty of felonious assault in violation of R.C. 2903.11(A)(2), which provides: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

**{¶50}** The jury was given a complicity instruction pursuant to R.C. 2923.03(A)(2), which provides in relevant part: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" To "aid and abet" is "'[t]o assist or facilitate the commission of a crime, or to promote its accomplishment.'" *State v. Johnson*, 93 Ohio St.3d 240, 243, 2001-Ohio-1336, 754 N.E.2d 796, quoting *Black's Law Dictionary* (7 Ed.Rev.1999) 69. This can be inferred from the circumstances surrounding the crime. Participation in criminal intent may be inferred from one's presence, companionship, and conduct before and after the offense is committed. *Id.* at 245, citing *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

**{¶51}** Thus, we must consider the evidence presented at trial to determine if it was sufficient to support the jury's verdict.

Case No. 22 MA 0013

**{¶52}** Thomas Toporcer was one of the paramedics who responded to the scene where Davis was found. Toporcer testified that he arrived at 2:00 a.m. to 1622 Stewart Street where he found Davis lying on the front porch. (Tr. 456). Toporcer noticed two gunshot wounds to Davis's right upper back. (Tr. 456).

**{¶53}** The 911 call supervisor identified the tape of the 911 calls placed that night. He confirmed that the woman caller stated that she saw two people leaving the area of the car (Davis's car). (Tr. 445).

**{¶54}** Youngstown Police Officer Anthony Marzullo responded to the scene. He stated the field where Davis's car was found was located across an intersection from 1662 Stewart Street. (Tr. 490). He testified that there were blood spots on the sidewalk and driveway of the Stewart Street house. (Tr. 491, 493; State Ex. 11). He also testified a .40 caliber Hornady shell casing was found there. (Tr. 493; State Ex. 57). And he testified several .40 caliber Hornady shell casings were found in and around Davis's vehicle. (Tr. 504; State Exs. 58-61). Officer Marzullo next testified that .22 caliber CCI shell casings were found in the car. (Tr. 505-506; State Exs. 62, 63). And he testified that .380 caliber Winchester shell casings were also found in the car. (Tr. 506; State Exs. 64, 65).

**{¶55}** Joshua Barr, a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation (BCI), testified regarding firearms identification. Barr testified that based on the shell casings submitted, there were at least three different firearms used in this case, a .40 caliber, a .380 caliber, and a .22 caliber. (Tr. 596-598).

**{¶56}** Lindsey Nelsen-Rausch is a forensic scientist in BCI's forensic biology section. She tested the DNA samples from this case. Nelsen-Rausch stated that her testing revealed that Appellant's DNA was a major contributor (with an estimated frequency of one in 500 billion) to the DNA recovered from the rear passenger door interior handle. (Tr. 631-633). She also testified that Appellant's DNA was a major contributor (with an estimated frequency of rarer than one in one trillion) to the DNA recovered from the rear passenger door exterior handle. (Tr. 633-634).

**{¶57}** Dr. Joseph Felo, a forensic pathologist, testified that Jackson suffered nine gunshot wounds. (Tr. 678). Dr. Felo also stated that the gunshot wounds were consistent with the shooters being behind Jackson when he was shot. (Tr. 704).

{¶58} Youngstown Police Detective Michael Lambert was the final witness. Det. Lambert was able to determine that the car Jackson was found in belonged to Davis. (Tr. 764). He stated that a blood trail led from the street to 1622 Stewart Street where Davis was discovered on the porch. (Tr. 767). The detective learned that on the night in question, Jackson had left his car at Davis's girlfriend's house and Jackson and Davis had left together in Davis's car. (Tr. 770).

{¶59} After Det. Lambert and other officers spoke with Davis, Det. Lambert began looking at a particular suspect who went by the nickname "Yung Chip." (Tr. 775). "Yung Chip" is Hopkins's nickname. (Tr. 777). After BCI determined that Appellant's DNA was located both on the interior and exterior door handles of Davis's car, Det. Lambert then added Appellant as a suspect. (Tr. 784). Det. Lambert determined through social media that Appellant and Hopkins were associated with each other. (Tr. 785-786). Det. Lambert then spoke with Davis again and, after that conversation, Appellant remained a suspect in the case. (Tr. 786).

{¶60} Det. Lambert next testified regarding what he found during his Facebook search. The detective obtained search warrants for Appellant's and Hopkins's Facebook accounts. He found that Hopkins communicated by phone with Jackson on November 18, 2018, at 12:07 a.m., 12:36 a.m., and 12:59 a.m. (Tr. 794-795). These calls were followed by three messages between Hopkins and Jackson at approximately 1:00 a.m. (Tr. 796-797). The messages were then followed by two more calls at 1:04 a.m. and 1:12 a.m. (Tr. 797). Police were dispatched to the homicide scene at 1:52 a.m. (Tr. 796). Hopkins then sent a message to Jackson's account at 2:11 a.m., after Jackson was killed. (Tr. 798). Det. Lambert testified that Hopkins was also communicating with Appellant during the same time with messages/calls to Appellant at 11:29 p.m. on November 17, 2018, and 12:00 a.m., 1:00 a.m., and 2:18 a.m. on November 18, 2018. (Tr. 802-804). And Det. Lambert testified that on November 2, 2018, Appellant made a comment on Facebook to Dom Phillips stating, "Already you to blood n whenever Treal give me that 380 tomorrow he might be fakin but you can hold on to that bitch since I got the 40." (Sic.; Tr. 811). The detective confirmed that both .380 caliber and .40 caliber shell casings were found inside and outside of Davis's car. (Tr. 812).

**{¶61}** Det. Lambert also testified regarding his interview of Appellant. He stated that Appellant initially denied knowing Hopkins or Jackson. (Tr. 816-820). Det. Lambert stated that Appellant eventually admitted to knowing Hopkins after the detective showed him Facebook pictures with the two of them. (Tr. 817-819). Appellant admitted to knowing Jackson only after Det. Lambert informed Appellant that his DNA was found in Davis's car. (Tr. 820-822).

**{¶62}** Det. Lambert stated that he had to leave the interview room to deal with another matter. (Tr. 824). Before leaving, he warned Appellant that he was still being video and audio recorded. (Tr. 824-825). While Appellant was alone in the interview room, he began to pray. (Tr. 826). Det. Lambert read to the jury from a transcript of what Appellant said: "God be with me. Guide me through (inaudible). Guide me through. I know I took one of your children but I also blessed you with plenty more. So if you can just have faith and power to accept me for things to get better than they are, yes." (Tr. 826).

**{¶63}** Finally, Det. Lambert testified that in a phone call Appellant made from jail, after Appellant knew police had found his DNA at the scene, Appellant stated, "I didn't touch him, I never touched him." (Tr. 830; State Ex. 188).

**{¶64}** While there was no direct evidence to support Appellant's conviction for attempted murder/felonious assault, there is sufficient circumstantial evidence. Circumstantial evidence and direct evidence have the same probative value. S*tate v. Dodds*, 7th Dist. Mahoning No. 05 MA 236, 2007-Ohio-3403, 2007 WL 1897774, ¶ 88, citing *Jenks*, 61 Ohio St.3d at 272, 574 N.E.2d 492. "A conviction based on purely circumstantial evidence is no less sound than a conviction based on direct evidence." *State v. Begley*, 12th Dist. Butler No. CA92-05-076, 1992 WL 379379, *2 (Dec. 21, 1992), citing *State v. Apanovitch*, 33 Ohio St.3d 19, 27, 514 N.E.2d 394 (1987).

**{¶65}** From the evidence, the jury could deduce the following. Appellant and Hopkins were in contact with each other and Jackson in the hours and minutes leading up to the shooting. Davis and Jackson were in Davis's car together in the hours leading up to the shooting. Jackson was found dead in the front passenger seat of Davis's car. Jackson had been shot nine times from behind. Davis was found at a house near the field where his car was located. A trail of blood led from the street and up the driveway

to Davis. Davis had been shot twice in the back. From this evidence, it is reasonable to conclude that the person, or persons, who shot Jackson, also shot Davis.

**{¶66}** Further, the evidence demonstrated that Appellant's DNA was found on Davis's car on the rear passenger-side door interior and exterior handles, indicating that at some point, Appellant entered and exited Davis's backseat. From the shell casings left behind, it was reasonable to conclude that at least three different firearms were used during the shooting, supporting the idea that there were three shooters. Just weeks before the shooting, Appellant commented about having a "40" and not needing the "380". A .40 caliber and .380 caliber were identified as two of the firearms used in this shooting. And when Appellant was left alone in the interview room after hours of questioning by Det. Lambert regarding the shooting, he prayed to God admitting that he "took one of [God's] children." Finally, after learning that his DNA was found on Davis's car and being arrested, Appellant stated on the phone that he "never touched him."

**{¶67}** This circumstantial evidence, taken as whole and construed in favor of the state as we are required to do, was sufficient to convict Appellant of the attempted murder/felonious assault of Davis. Whether Appellant acted as the principal or in complicity with the principal, the evidence is sufficient to demonstrate he was one of three shooters that night. This court previously found that when 15 shots were fired into a car carrying four victims, it was sufficient from the number of shots fired into the single car to find that the Appellant intended to cause the death of everyone inside the car. *State v. Heard*, 7th Dist. Mahoning No. 17 MA 0064, 2019-Ohio-1227, ¶ 32. Additionally, we have found: "'The mere act of driving away from the scene of a shooting perpetrated by a passenger of a vehicle has been held to be sufficient to uphold a conviction based on complicity where the circumstances show the driver knew shots were being fired by the passenger.'" *State v. Gilbert*, 7th Dist. Mahoning No. 08 MA 206, 2012-Ohio-1165, ¶ 60, quoting *State v. Garner*, 10th Dist. No. 07AP-474, 2008-Ohio-944, ¶ 21.

**{¶68}** Consequently, we cannot conclude the trial court erred in overruling Appellant's motion for acquittal on the attempted murder and felonious assault charges.

**{¶69}** Accordingly, Appellant's fourth assignment of error is without merit and is overruled.

**{¶70}** For the reasons stated above, the trial court's judgment is hereby affirmed.


Waite, J., concurs.

Robb, J., concurs.

———————————————

For the reasons stated in the Opinion rendered herein, the assignments of errors are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs are waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**