OPINION
{¶ 1} Defendant-appellant David Dodds appeals from his conviction of gambling, a violation of R.C. 2915.02(A), and possession of criminal tools, a violation of R.C. 2923.24(A), that was entered in Mahoning County Court No. 4. The issues raised in this appeal are whether there was sufficient evidence to support the convictions and whether the convictions were against the manifest weight of the evidence. For the reasons stated below, the judgment of the trial court is affirmed.
 STATEMENT OF CASE AND FACTS {¶ 2} On March 12, 2005, officers from the Austintown Police Department searched the premises of Theodore's Banquet Center and T G Lounge located at 1400 and 1404 Niles Canfield Road, located in Mahoning County, Ohio. The search was performed pursuant to a search warrant.
 {¶ 3} The warrant was obtained because police had noticed over a few months that numerous cars were parked in the parking lot after hours. When officers looked in windows, which were partially blocked off, they noticed people standing around a dice table.
 {¶ 4} On the day of the search, police entered the facility and arrested nine people and charged them with various gambling offenses. The dice game being played on that night was Barbutt. David Dodds was one of the nine charged with gambling and possession of criminal tools, which in this case was U.S. currency.
 {¶ 5} A bench trial was held on October 20, 2005. Dodds was found guilty of both charges. For the gambling conviction, the trial court sentenced him to 180 days with 150 days suspended, and the remanding 30 to be served at EMHA within 14 days for the gambling offense. He was also fined $250 plus costs on that conviction. For possession of criminal tools, Dodds was sentenced to 180 days with 150 suspended and the remaining 30 days to be served at EMHA within 30 days. He was also fined $250 plus costs and received 12 months probation.
 {¶ 6} Dodds timely appeals. The trial court stayed the sentence pending appeal. *Page 3 
 ASSIGNMENT OF ERROR {¶ 7} "THE COURT ERRED IN FINDING DOWD [SIC] GUILTY OF GAMBLING AND POSSESSION OF CRIMINAL TOOLS SINCE THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH GUILT BEYOND A REASONABLE DOUBT."
 {¶ 8} While the above assignment of error speaks only to sufficiency of the evidence, Dodds' argument raises both sufficiency and manifest weight arguments.
 {¶ 9} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citing State v. Thompkins, 78 Ohio St.3d 380, 390, 1997-Ohio-52.
 {¶ 10} In order to find a conviction was supported by sufficient evidence, this court must review the evidence in a light most favorable to the prosecution. State v. Jenks (1991), 61 Ohio St.3d 259, 279. In contrast, where an appellate court reviews a claim that a verdict is against the manifest weight of the evidence, the court sits as a "thirteenth juror" and either agrees or disagrees with the fact finder's resolution of conflicting testimony. Thompkins, 78 Ohio St.3d at 387. An appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id.
 {¶ 11} Dodds was convicted of gambling, a violation of R.C. 2915.02(A) and possession of criminal tools, a violation of R.C. 2923.24(A). Each charge will be addressed separately.
 {¶ 12} The gambling statute, R.C. 2915.02(A) prohibits a person from knowingly engaging in conduct that "facilitates any game of chance conducted for profit or any scheme of chance." R.C. 2915.02(A)(2). The statute states that for purposes of division (A)(2), "a person facilitates a game of chance conducted for profit or a scheme of chance if the person in any way knowingly aids in the conduct or operation of any *Page 4 
such game or scheme, including, without limitation playing any such game or scheme." R.C. 2915.02(B).
 {¶ 13} It is undisputed that Barbutt was the game being played that night at Theodore's. Consequently, Barbutt must either be a "game of chance conducted for profit" or a "scheme of chance." Both of these phrases are defined in R.C. 2915.01. A game of chance is defined as "poker, craps, roulette, or other game in which a player gives anything of value in hope of gain, the outcome of which is determined largely by chance, but does not include bingo." R.C. 2915.01(D). A scheme of chance includes slot machines, lottery, numbers games, pools conducted for profit. R.C. 2915.01(C). Barbutt would fall under the definition of game of chance.
 {¶ 14} Furthermore, the statute requires a game of chance to beconducted for profit. R.C. 2915.01(E) defines "game of chance conducted for profit" as "any game of chance designed to produce income for the person who conducts or operates the game of chance, but does not include bingo." The word "conduct" is also defined by statute. It means "to back, promote, organize, manage, carry on, sponsor, or prepare for the operation of bingo or a game of chance." R.C. 2915.01(T).
 {¶ 15} Thus, in order for Dodds' conviction for gambling to be upheld there must be evidence that he facilitated the game of Barbutt and that Barbutt was being played for profit. In regards to the facilitating element of the gambling charge, there was evidence that Dodds was playing the game of Barbutt.
 {¶ 16} An officer testified that Dodds was around the table when the police came in. (Tr. 51). He testified that anyone around the table was charged with gambling. (Tr. 51). Another officer testified that he took status information from Dodds and he took $1,000 from his person. (Tr. 82).
 {¶ 17} One of the state's witnesses was Donna Merrill. She was at Theodore's on the night in question. (Tr. 96). She explained that she went to Theodore's that night with Dodds so that she could play and party. (Tr. 97). She explained that that night she was playing Barbutt, she explained that it is a dice game and explained how it is played. (Tr. 100-104). She indicated that she did not have to pay an entrance fee to play. (Tr. 108). *Page 5 
 {¶ 18} Donna's testimony concerning whether or not Dodds played the game is as follows:
 {¶ 19} "Q. Now, during the — when you saw the game being played and you were participating, did you see David playing this game?
 {¶ 20} "A. I don't pay attention to anybody playing. I figure everybody is there to play." (Tr. 108).
 {¶ 21} However, later she testified that Dodds was playing.
 {¶ 22} "Q. [Prosecutor] — by others? Do you remember seeing him playing the game [it is unclear which defendant the prosecutor is talking about]?
 {¶ 23} "A. I'm sure mostly everybody played.
 {¶ 24} "Q. This gentleman here? [unclear which defendant]
 {¶ 25} "A. He never played.
 {¶ 26} "* * *
 {¶ 27} "Q. This gentleman here, Dave?
 {¶ 28} "A. Probably everybody there played.
 {¶ 29} "Q. I'm asking you about him.
 {¶ 30} "A. Yeah.
 {¶ 31} "Q. Did he play?
 {¶ 32} "A. I'm sure." (Tr. 122).
 {¶ 33} Thus, as there was no other defendant named Dave or David, her testimony when viewed in the light most favorable to the state shows that Dodds did play. Furthermore, the fact that an officer saw him around the table and that he had $1,000 on his person, also when viewed in the light most favorable to the prosecution indicates that he was facilitating the game.
 {¶ 34} The next element is that the game of Barbutt must have been played for a profit. There was some testimony concerning whether the game was conducted for profit, i.e. whether the house/dealer got a cut. Donna testified that she lost that night. (Tr. 106). She explained that if she won she could "tip" somebody if she wanted. (Tr. 107, 113). Or, in other words, she could tip the dealer/house. She testified that the dealer did not get a cut per se. (Tr. 113). In explaining this, she testified as follows:
 {¶ 35} "Q. [Prosecutor] Okay. There is a cut to the dealer; is that correct? *Page 6 
 {¶ 36} "A. [Donna] What do you mean a cut?
 {¶ 37} "Q. Is there a five percent cut for the dealer, or for the house?
 {¶ 38} "A. You can, you give them, you know, —
 {¶ 39} "Q. What's the usual standard, percentage?
 {¶ 40} "A. Just like going to a restaurant, you given them a, $2, $1. You can give them $1; you can given them two, you know, $20, you don't give them nothing.
 {¶ 41} "Q. What is the usual percentage, ma'am?
 {¶ 42} "* * *
 {¶ 43} "A. Some of the games they do three to five. I didn't pay any rake that night so I can't say?" (Tr. 112-113).
 {¶ 44} However, she explained that she did not see anybody pay a rake that night because she was sitting down or drinking coffee. (Tr. 113-114). She stated that she does not know who paid a rake that night, but she is sure somebody did. (Tr. 115). She said that if a rake is paid, then the dealer puts the money in the box on the table. (Tr. 114). She testified that she does not remember whether Dodds paid a rake that night. (Tr. 126). She also testified that the rake could go to pay for the food for the night. (Tr. 127).
 {¶ 45} Donna was shown the ledger, but she could not identify what it was. (Tr. 118). However, she did state that Dodds' name was on it and her name was on it. (Tr. 118-119).
 {¶ 46} Another woman, Twila Borrell, who was there that night also testified. When asked about the house/dealer's cut, i.e. paying a rake, she stated:
 {¶ 47} "Q. [Prosecutor] There were winners and there were losers; is that correct? Is there someone who gets a percentage or cut?
 {¶ 48} "A. [Twila] (Inaudible.)
 {¶ 49} "Q. You don't know anything about the cut?
 {¶ 50} "A. I don't know about it; I don't care about it. I don't care what they do. I just wanted to play.
 {¶ 51} "Q. All right. And did you play?
 {¶ 52} "A. Yes, I did.
 {¶ 53} "Q. And did you have to tip anybody to play? *Page 7 
 {¶ 54} "A. You can tip.
 {¶ 55} "Q. I didn't ask you that.
 {¶ 56} "A. If you're winning you can tip. If your winning you can pay; they take it towards food.
 {¶ 57} "Q. As far as you know?
 {¶ 58} "A. Right as far as I know. I don't care what they —." (Tr. 175-176).
 {¶ 59} Twila further testified that she did not tip anybody that night and she did not pay attention to whether anyone else was tipping. (Tr. 176).
 {¶ 60} One of the last witnesses to testify was Officer Solic, the inventory officer. (Tr. 197). His testimony was offered to try to show that the ledger was used to track the gambling. He testified as follows:
 {¶ 61} "Q. [Prosecutor] Now, from your training, education and experience, have you investigated gambling activities in the past?
 {¶ 62} "A. [Solic] Not gambling but narcotics.
 {¶ 63} "Q. And do people who run —
 {¶ 64} "Mr. Maillis [counsel for one of the co-defendants]: Objection, Your Honor. He said he's never investigated a gambling case before. So if he's going to ask him what that piece of paper is going to be, note my objection.
 {¶ 65} "Judge D'Apolito: (Inaudible.)
 {¶ 66} "Q. And do people who participate in illegal drug activity keep records or notes similar to the ones you see?
 {¶ 67} "Mr. Maillis: Objection.
 {¶ 68} "Unidentified Speaker: Objection. Immaterial. Irrelevant.
 {¶ 69} "Judge D'Apolito: (Inaudible.)
 {¶ 70} "A. (Inaudible.)
 {¶ 71} "Q. Yes, do they?
 {¶ 72} "A. Yes, sir.
 {¶ 73} "Q. Now, the document that — you say came from Victor Maillis?
 {¶ 74} "A. Yes.
 {¶ 75} "Q. Were you investigating narcotic drug activity?
 {¶ 76} "A. At this time, no.
 {¶ 77} "Q. Were you investigating gambling activity? *Page 8 
 {¶ 78} "A. Yes, Sir.
 {¶ 79} "Q. What did you, did you use your experience in narcotics to identify that document used in this gambling activity?
 {¶ 80} "* * *
 {¶ 81} "A. My experience as an investigator would lead me to believe that this ledger is a notation for monies owed.
 {¶ 82} "Q. By the participants?
 {¶ 83} "A. By the individual whose name and number appears that would be my experience that that individual would owe the holder of the ledger that amount of money." (Tr. 199-201).
 {¶ 84} Thus, Solic's testimony, if believed, established that Dodds and some others owed Victor Maillis, the dealer, money. Yet, Dodds' attorney asked whether the note indicated any evidence of illegal activity, or in other words if someone had borrowed or lent money was that illegal. (Tr. 201). The officer testified that to borrow or lend money in and of itself is not illegal. (Tr. 202).
 {¶ 85} None of the testimony provides direct evidence that the house/dealer got a cut. However, testimony does establish that it is customary for the winner to pay a percentage to the house/dealer. Donna indicated as such and so did Twila. Donna even testified that while she did not see anybody pay a cut she is sure someone did. This evidence, along with the ledger and the fact that the banquet room was often times rented by names on the ledger, when viewed in the light most favorable to the state, is sufficient to show that the house/dealer did get a cut.
 {¶ 86} Furthermore, it is not clear that the trial court clearly lost its way when it found him guilty of the gambling charge. Whether the trial court believed Donna and Twila's testimony concerning whether or not Dodds played and whether or not the house/dealer got a cut is a credibility question. The trier of fact is in the best position to make factual findings since it has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections which cannot be conveyed on appeal through the written record. Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 79-80. *Page 9 
 {¶ 87} Donna and Twila's testimony established that it is customary that when someone wins to pay a percentage to the house/dealer. When that money was paid it was put into the box in front of the dealer. Money confiscated from the dealer box on the table was $1,871. (Tr. 27). Also, on the night in question, the police observed people standing around the large dice table and there was money on the dice table, there was a dice rake, die and a die cup. (Tr. 24). The police confiscated about $1,600 from the dice table playing area. (Tr. 27). Furthermore, there was a ledger that allegedly showed who owed money to the house/dealer. (Tr. 39). Additionally, this game was occurring after regular business hours at around 3:00 a.m. Likewise, the windows to the business were partially blocked by cardboard. Considering all this, there was sufficient evidence to find that the game of Barbutt was being "conducted for profit."
 {¶ 88} While this is not direct evidence that gambling was occurring it is circumstantial evidence. Circumstantial evidence and direct evidence have the same probative value, and in some instances, certain facts can be established only by circumstantial evidence.Jenks, 61 Ohio St.3d at 272. Even a conviction that is based solely on circumstantial evidence is no less sound than one based on direct evidence. State v. Begley (Dec. 21, 1992), 12th Dist. No. CA92-05-076. Considering the above, the conviction for gambling was not against the manifest weight of the evidence.
 {¶ 89} Dodds was also convicted of possession of criminal tools. The possession of criminal tools statute prohibits a person from possessing or have under their control "any substance, device, instrument, or article, with purpose to use it criminally." R.C. 2923.24(A). In this case, the criminal tool was the $1,000 in U.S. currency found on Dodds' person.
 {¶ 90} Under R.C. 2915.02(A)(5) it is a crime to possess "gambling devices." "Gambling devices" are defined in R.C. 2915.01(F). The Ohio Supreme Court in State v. Volpe (1988), 38 Ohio St.3d 191, stated that if a person has possession of a "gambling device" then that person can only be charged under R.C. 2915.02 and cannot be charged under R.C.2923.24, the possession of criminal tools statute. *Page 10 
 {¶ 91} Money, U.S. Currency, is not listed as a "gambling device" under R.C. 2914.01(F). Thus, as Dodds could not be charged with possession of "gambling devices", he was correctly charged with possession of criminal tools.
 {¶ 92} The Eighth Appellate District in State v. Earle (Oct. 10, 1991), 8th Dist. No. 59120, explaining the Volpe case stated that an individual cannot be convicted of possessing criminal tools under R.C.2923.24 for possessing a "gambling device." It then explained that while appellant had been indicted for possessing various gambling devices, he was also indicted for possessing a membership notebook and money. Thus, the Eighth District concluded that based upon the membership notebook and money, appellant's possession of criminal tools conviction was not contrary to law.
 {¶ 93} Considering all of the above, and the fact that we have found that Dodds' gambling conviction was sufficient and not against the manifest weight of the evidence, the conviction for possession of criminal tools, U.S. currency, is sufficient and not against the manifest weight of the evidence. The money was in Dodds' possession and he was gambling, thus, it can be concluded that he had the money for the purpose to use it criminally.
 {¶ 94} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
 DeGenaro, P.J., concurs. Donofrio, J., concurs. *Page 1