# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

COREY W. WOOD,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 24 BE 0024

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 23 CR 9

**BEFORE:**
Mark A. Hanni, Carol Ann Robb, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. J. Kevin Flanagan*, Belmont County Prosecutor, and *Atty. Jacob A. Manning*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Brian A. Smith*, Brian A. Smith Law Firm, LLC, for Defendant-Appellant.

Dated: December 10, 2024

**HANNI, J.**

{¶1} Defendant-Appellant, Corey W. Wood, appeals from a Belmont County Common Pleas Court judgment convicting him of illegal conveyance of drugs of abuse onto the grounds of a detention facility, following a jury trial. Appellant argues his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Because Appellant's conviction was supported by both the sufficiency and the manifest weight of the evidence, the trial court's judgment is affirmed.

{¶2} On May 13, 2022, Appellant was an inmate at Belmont Correctional Institution. Appellant's friend, Heather Vann, came to visit him. After purchasing food in the visitation area, Vann removed an "inmate pass" from her bra band and placed it underneath a sandwich on her tray. An "inmate pass" is used by inmates when they travel to various parts of the prison. Vann's actions aroused the suspicion of Officer Cody Foraker. He alerted Lieutenant Denise Henry. The two confronted Vann and found the inmate pass under the burger. When Officer Foraker held the inmate pass up to the light, he noticed that it appeared to have been sprayed with something.

{¶3} According to prison employees, it is an ongoing problem in the prison for inmates to attempt to receive synthetic marijuana, which is sprayed onto pieces of paper and then transported into the prison. The pieces of drug-sprayed paper are then sold to inmates who smoke them to get high. A paper the size of an inmate pass can be worth around $9,000 inside the prison.

{¶4} As Vann was being led out of the visitation area, Appellant yelled to her not to say anything. Later testing revealed that the inmate pass had been sprayed with synthetic marijuana.

{¶5} A Belmont County Grand Jury indicted Appellant on one count of illegal conveyance of drugs of abuse onto the grounds of a detention facility, a third-degree felony in violation of R.C. 2921.36(A)(2) and R.C. 2921.36(G)(2), and one count of complicity to commit illegal conveyance of drugs of abuse onto the grounds of a detention facility, a third-degree felony in violation of R.C. 2923.03(A)(1) and R.C. 2923.03(F).

{¶6} The matter proceeded to a jury trial. The jury found Appellant guilty as charged. The trial court set the matter for a sentencing hearing.

Case No. 24 BE 0024

{¶7} At the sentencing hearing, the trial court found the two counts merged for sentencing. It sentenced Appellant to 36 months in prison.

{¶8} Appellant filed a timely notice of appeal on June 27, 2024. He now raises two assignments of error for our review.

{¶9} Appellant's first assignment of error states:

APPELLANT'S CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶10} Appellant argues his conviction is not supported by sufficient evidence. He asserts the State failed to produce evidence that he "knowingly" conveyed or was complicit in conveying a "drug of abuse" into the prison. He points out that while the State played several phone calls between Vann and him, he never asked Vann to bring a "drug of abuse" into the prison for him.

{¶11} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Dickson*, 2013-Ohio-5293, ¶ 10 (7th Dist.), citing *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). Sufficiency is a test of adequacy. *Id*. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id*. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *Id*., citing *State v. Goff*, 1998-Ohio-369. When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *Id*., citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273 (1991) (superseded by state constitutional amendment on other grounds).

{¶12} A sufficiency of the evidence challenge tests the burden of production while a manifest weight challenge tests the burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring). Therefore, when reviewing a sufficiency challenge, the court does not evaluate witness credibility. *State v. Yarbrough*, 2002-Ohio-

2126.  Instead, the court looks at whether the evidence is sufficient if believed.  *Id.* at ¶ 82.

{¶13} The jury convicted Appellant of violating R.C. 2921.36(A)(2), which provides:

(A)   No person shall knowingly convey, or attempt to convey, onto the grounds of a detention facility . . . any of the following items:

. . .

(2) Any drug of abuse, as defined in section 3719.011 of the Revised Code[.]

{¶14}  In order to be convicted of the above offense, the State must prove that the offender acted "knowingly."  Pursuant to R.C. 2901.22(B):

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist.  When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶15}  We must now examine the State's evidence to determine if it was sufficient to support Appellant's conviction.

{¶16}  Officer Cody Foraker was the State's first witness.  On the day Vann went to visit Appellant in prison, Officer Foraker was working in the prison monitoring the visitation area.  He noticed that after Vann got her food, she kept staring at him and at the camera monitoring the area.  (Tr. 131-132).  He then watched as Vann removed something from her clothing and placed it on the plate she was holding.  (Tr. 132).  Officer Foraker notified Lieutenant Denise Henry.  (Tr. 132).  Once Lt. Henry arrived, they searched the plate of food and found a folded-up piece of paper under a sandwich.  (Tr.

133). They unfolded it and saw that it was an inmate pass. (Tr. 133). When Officer Foraker held the pass up to the light, he could see that something had been sprayed on it. (Tr. 134). He testified that at this point, Appellant walked into the visitation area and was handcuffed immediately. (Tr. 134). As Appellant was being led out, Officer Foraker heard Appellant yell to Vann, "Don't say nothing. They have nothing." (Tr. 136). Officer Foraker also testified that during his time at the prison, he has seen inmates high on "K2", which is a substance that is sprayed on paper and then smoked. (Tr. 137).

{¶17} Lt. Henry was the next witness. She testified that on the day in question Officer Foraker contacted her, informed her of what he had seen, and asked her to come out to the visitation area. (Tr. 156). Lt. Henry stated that they found an inmate pass on Vann's plate under the sandwich. (Tr. 156). She testified that once Officer Foraker noticed that something appeared to have been sprayed on the inmate pass, she contacted Investigator Paul Bumgardner to assist her. (Tr. 159-160). The lieutenant testified that as she and Investigator Bumgardner were escorting Vann out of the visitation area, she heard Appellant yell to Vann, "Don't say anything. Don't say anything." (Tr. 161).

{¶18} Investigator Bumgardner testified next. Investigator Bumgardner stated that he responded to a call about a possible conveyance onto the prison grounds. (Tr. 176). When he arrived in the visitation area, he saw the inmate pass that appeared to have an unknown substance on it. (Tr. 179). The investigator testified that the prison has had an issue with a synthetic cannabinoid being sprayed on papers that are then brought into the institution. (Tr. 180). He stated that the inmates smoke or "vape" the paper to get high. (Tr. 180). He testified that the value of the drug-sprayed inmate pass inside the prison was $9,000. (Tr. 197-198).

{¶19} Investigator Bumgardner confiscated the inmate pass. (Tr. 182). He then escorted Vann out of the visitation area. (Tr. 183). As they were walking out, he heard Appellant yell to Vann, "Don't say anything. You don't have to say anything." (Tr. 184). Investigator Bumgardner then contacted the Ohio State Highway Patrol (OSHP) to respond to the situation. (Tr. 187). He turned over the inmate pass to OSHP Sergeant Shawn Allar. (Tr. 189).

{¶20} Next, the parties stipulated that the substance on the inmate pass was a

Schedule I compound, making it a drug of abuse. (Tr. 214-215).

**{¶21}** Sgt. Allar was the next witness. Sgt. Allar sent the inmate pass to the Ohio Bureau of Criminal Identification and Investigation (BCI) for testing. (Tr. 245). He testified that the inmate pass tested positive for the presence of MDMB-4en-PINACA, which is a Schedule I substance meeting the requirements for a synthetic cannabinoid pharmacophore. (Tr. 246-247).

**{¶22}** Sgt. Allar also testified regarding several recorded telephone calls made by Appellant from the prison to Vann. In one of the calls, made on May 7, 2022, Appellant and Vann discussed something being shipped from Mexico. (Tr. 255-259). In a May 12, 2022 call, Appellant gave Vann instructions about how to fill out the inmate pass. (Tr. 260-262). Appellant made these two calls prior to May 13, 2022, when Vann brought the inmate pass to the prison. (Tr. 262-263).

**{¶23}** Sgt. Allar also testified regarding calls Appellant made to Vann after she brought the inmate pass to the prison. On the same day as the incident, Appellant called Vann and she referred to her car being searched. (Tr. 264). Later that same day, Appellant called Vann two more times. (Tr. 269).

**{¶24}** Vann was the State's last witness. Vann testified that she and Appellant had been romantically involved prior to his incarceration. (Tr. 219-292). After he was incarcerated they still maintained contact with each other. (Tr. 292). She stated she visited Appellant in May 2022. (Tr. 294). Vann testified that prior to this visit, Appellant had asked her to contact someone through "JPay", which is a type of email system, and that person sent the inmate pass to her house. (Tr. 295). She stated the person she contacted was incarcerated in Mexico. (Tr. 295). Vann stated that Appellant did tattoos in prison for which inmates' family members would pay him directly into her "Cash App" account. (Tr. 296-297). She used this money of Appellant's to purchase the inmate pass for $400-$500. (Tr. 296-298). Vann paid the money to someone in Mexico, also using "Cash App." (Tr. 299-300). She communicated with the person on "Cash App" named Adan Duran-Enriquez, whom Appellant told her to message. (Tr. 309). Vann told the person she sent money for "one" and "when it gets closer, I will send out for the other one." (Tr. 309-310). She stated that she and Appellant had planned on purchasing a second pass. (Tr. 310).

**{¶25}** Four days after making the payment, Vann received the inmate pass in the mail. (Tr. 300). Following Appellant's instructions, Vann opened the sealed package, retrieved the inmate pass, and filled in some of the blank spaces. (Tr. 306). She testified that she believed the pass was so that Appellant could use it to access different areas of the prison. (Tr. 306-307).

**{¶26}** Vann testified regarding some of her phone calls with Appellant in the days leading up to her visit. In one call, she stated, Appellant used a code word when referring to the pass so they would not get caught. (Tr. 302). They also discussed the inmate pass coming in a sealed package, which is how it arrived. (Tr. 300, 302). At one point, Appellant instructed Vann not to copy the pass. (Tr. 304). He later told her, "I am doing what they told me to do." (Tr. 304). Vann stated she did not know who "they" were. (Tr. 304). In another part of a call, Appellant told Vann that he would help her financially to pay for repairs to her well if she brought him the inmate pass. (Tr. 307). In a call from Appellant to Vann after the inmate pass was confiscated, Appellant told Vann that he told people "it was all on" him. (Tr. 319-320). She interpreted this to mean that he was letting people know that it was his idea, not hers. (Tr. 320).

**{¶27}** Vann testified that at prison visits, the visitors are permitted to purchase food and eat with the inmate they are visiting. (Tr. 294). At this particular visit, Vann purchased a sandwich and chips. (Tr. 294). She then took the inmate pass out of her bra band. (Tr. 294). She placed the inmate pass onto the plate of food for Appellant. (Tr. 294).

**{¶28}** Vann testified that after they were caught by the corrections officer and she was being led from the visitation area, Appellant yelled to her "don't say a word." (Tr. 312). She stated this raised a red flag for her because if the inmate pass was just a piece of paper, she did not think it would be an issue. (Tr. 312). Vann testified that she then answered questions by Sgt. Allar. (Tr. 312). She also admitted to sending Appellant a message later on the day of the visitation on "JPay" stating: "Drugs, really? Just risked my freedom." (Tr. 316; State Ex. 6).

**{¶29}** This evidence is sufficient to support Appellant's conviction. There is no doubt that Vann brought the inmate pass into the prison when she came to visit Appellant and that the inmate pass contained a Schedule I substance. And while there was no

direct testimony that Appellant knowingly conveyed or attempted to convey drugs onto the grounds of the prison, there was ample evidence from which the jury could infer Appellant's intent.

**{¶30}** The evidence was uncontroverted that when the prison officials were escorting Vann from the visitation area, Appellant yelled to her not to say anything. This would indicate he had something to hide. Additionally, Vann testified that Appellant instructed her not to copy the inmate pass. Again, this would demonstrate that he knew a copy of the pass would not contain the drugs. Moreover, Appellant's phone conversations with Vann indicated that he knew Vann would be receiving the inmate pass in a shipment from Mexico and that he provided her with money for the purchase. One could infer that Appellant would not have paid $400 to $500 dollars for a simple copy of an inmate pass. And Appellant instructed Vann how to fill out the inmate pass in an attempt to make it look authentic. This could indicate an attempt to conceal the drugs on the paper. Considering all of this evidence as a whole, and construing it in favor of the State as we are required to do on a sufficiency of the evidence review, it is clear the State provided sufficient evidence that Appellant acted knowingly.

**{¶31}** The state can prove knowledge through either direct or circumstantial evidence. *State v. Jordan*, 2023-Ohio-3800, ¶ 26. Circumstantial evidence and direct evidence have the same probative value. *State v. Dodds*, 2007-Ohio-3403, ¶ 88 (7th Dist.), citing *Jenks*, 61 Ohio St.3d at 272. "A conviction based on purely circumstantial evidence is no less sound than a conviction based on direct evidence." *State v. Begley*, 1992 WL 379379 (12th Dist. Dec. 21, 1992), citing *State v. Apanovitch*, 33 Ohio St.3d 19, 27 (1987).

**{¶32}** Accordingly, Appellant's first assignment of error is without merit and is overruled.

**{¶33}** Appellant's second assignment of error states:

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶34}** Here, Appellant contends his conviction is not supported by the manifest weight of the evidence. He again contends the phone calls between Vann and him failed

to show that he acted knowingly. He also points out that the phone calls do not corroborate Vann's testimony that he told her not make copies of the inmate pass. And Appellant argues that there would be no reason for him to give Vann specific instructions as to the date and time to put on the inmate pass if the pass was just to be sold and smoked. He further argues that Vann had an incentive to testify against him because she received a plea deal in exchange for her cooperation in this case.

**{¶35}** In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d 380. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* at 387, quoting *Black's Law Dictionary* (6 Ed.1990) (Emphasis sic). In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

**{¶36}** Only when "it is patently apparent that the factfinder lost its way," should an appellate court overturn the jury verdict. *State v. Woullard*, 2004-Ohio-3395, ¶ 81 (2d Dist.). If a conviction is against the manifest weight of the evidence, a new trial is to be ordered. *Thompkins* 78 Ohio St.3d at 387. "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." *State v. Miller*, 2002-Ohio-4931, ¶ 36 quoting Ohio Constitution, Article IV, Section 3(B)(3).

**{¶37}** Appellant's conviction is not against the manifest weight of the evidence. As discussed above, it was not just the phone calls between Appellant and Vann that established that he acted knowingly. It was the combination of several things that provided the evidence that Appellant acted knowingly: the phone calls; the statement Appellant yelled to Vann as she was being escorted from the visitation area; the instructions by Appellant of how to fill out the inmate pass; and the direction by Appellant to Vann not to copy the inmate pass.

**{¶38}** Additionally, Vann acknowledged that she was also charged with the same charges as Appellant. (Tr. 321). She testified that she entered a guilty plea to a reduced charge and that the State would possibly recommend probation for her. (Tr. 321). Thus, the jury was able to consider whether these facts may have affected Vann's credibility.

**{¶39}** Although an appellate court is permitted to independently weigh the credibility of the witnesses when determining whether a conviction is against the manifest weight of the evidence, we must give deference to the fact finder's determination of witnesses' credibility. *State v. Jackson*, 2009-Ohio-6407, ¶ 18 (7th Dist.). The policy underlying this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

**{¶40}** Based on the above, Appellant's conviction was not against the manifest weight of the evidence.

**{¶41}** Accordingly, Appellant's second assignment of error is without merit and is overruled.

**{¶42}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Robb, P.J., concurs.

Dickey, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**